1  **DONALD W. COOK**, CSB 116666
   ATTORNEY AT LAW
2  3435 Wilshire Blvd., Suite 2910
   Los Angeles, CA  90010
3  (213) 252-9444; (213) 252-0091 facsimile
   E-mail: manncook@earthlink.net
4
5  Attorney for Plaintiff

6

7

8              **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11 MARIO ALBERTO GARCIA, individually and as class representative, | Case No. EDCV13-0616 JGB (SPx) |
| 13        Plaintiff, | **FOURTH AMENDED CLASS ACTION COMPLAINT FOR DAMAGES** |
| 14 vs. | |
| 15 COUNTY OF RIVERSIDE; RIVERSIDE SHERIFF'S DEPARTMENT; COUNTY OF LOS ANGELES; LEE BACA, in both his personal and individual capacity; and DOES 1 through 10, both their personal and official capacities, | 1. 42 U.S.C. § 1983 - Fourth Amendment / Wrongful Incarceration; 2. 42 U.S.C. § 1983 - Fourteenth Amendment / Wrongful Incarceration; 3. Cal. Const. Art. I § 13 - Wrongful Incarceration - LA County; 4. False Imprisonment - LA County. |
| 19        Defendants. | |
| 22 | **DEMAND FOR JURY TRIAL** |

23

24

25

26

27

28

00118376.WPD

# TABLE OF CONTENTS

Page

I.      OVERVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.    Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        B.    Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.     FACTS COMMON TO ALL CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A. Biometric Identifiers Matched To Fingerprints. . . . . . . . . . . . . . . . . 3
              CII numbers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
              FBI numbers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
              LA Main numbers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        B. Livescan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        C. Warrant Databases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        D. CWS (County Warrant System). . . . . . . . . . . . . . . . . . . . . . . . . 6
        E. WPS (Wanted Person System). . . . . . . . . . . . . . . . . . . . . . . . . . 8
        F. Criminal Histories. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.      CLASS ACTION ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VI.     FACTS RE PLAINTIFF'S ARREST/INCARCERATION. . . . . . . . . . . . . 14

FIRST CAUSE OF ACTION
(42 U.S.C. § 1983 – Wrongful Incarceration/Fourth Amendment) . . . . . . . . . . . . . 21

SECOND CAUSE OF ACTION
        (42 U.S.C. § 1983 – Wrongful Incarceration/Fourteenth Amendment) . . . . . . 22

THIRD CAUSE OF ACTION
        (Cal. Const., Art. I § 13 – Wrongful Incarceration) . . . . . . . . . . . . . . . . . . 23

FOURTH CAUSE OF ACTION
        (False Imprisonment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        On the First through Third Causes of Action . . . . . . . . . . . . . . . . . . . . . 24
        On All Causes of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

DEMAND FOR JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## I.     OVERVIEW.

1. This action concerns the refusal of local criminal justice agencies to utilize readily available information and existing identification systems to accurately identify the subjects of warrants issued by the Los Angeles Superior Court, and to institute simple, common-sense processes to insure that when a warrant issues, it identities its subject by the unique identifiers law enforcement created years ago to address the problem of different persons sharing the same and/or similar names, birthdates, physical descriptors, and the problems of persons using aliases, stealing others identities, etc. Related to this are the agencies' indifference to instances where the same person is repeatedly arrested on a warrant meant for another, an indifference that manifests itself by the agencies' refusal to do anything to prevent the person's re-arrest on the same warrant notwithstanding the agencies' knowledge, beforehand, that the person is *not* the warrant's subject.

2. As a result, persons who are not the subject of warrants are not only arrested on warrants meant for others, but can and are arrested again and again on the same warrants. Moreover, whenever someone is arrested on a warrant, the warrant is removed from the various data systems law enforcement uses to check for outstanding warrants. So if the *wrong* person is arrested on the warrant, the warrant's intended subject will no longer face arrest on the warrant. In other words, criminals get a free pass.

3. Plaintiff presents federal claims for relief that arise under 42 U.S.C. § 1983, and supplemental state law claims actionable under the California constitution and false imprisonment. Plaintiff also seeks certification of Plaintiff's damages class against certain Defendants.

///

///

-1-

00118376.WPD

## II.     JURISDICTION.

4. Plaintiff's claims arise under 42 U.S.C. §1983. Accordingly, federal jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

5. Plaintiff's claims arise out of, *inter alia*, acts of the County of Riverside ("Riverside County"), Riverside County Sheriff's Department ("RCSD"), County of Los Angeles ("LA County") and the Los Angeles Sheriff's Department ("LASD"). Accordingly, venue is proper within the Central District of California.

## III.    PARTIES.

### A.     Plaintiff.

6. Plaintiff Mario Alberto Garcia is, and was at all times relevant hereto, a resident of the County of Riverside.

### B.     Defendants.

7. The County of Riverside ("Riverside County") is a local governmental entity organized and existing under the laws of the State of California. The Riverside County Sheriff's Department ("RCSD") is a public entity within the meaning of California law, and is a Riverside County agency.

8. Defendant County of Los Angeles ("LA County") is a local governmental entity organized and existing under the laws of the State of California. LASD is a public entity within the meaning of California law, and is a LA County agency.

9. Defendant Lee Baca ("Baca") is an individual and at the relevant times hereto, was the Sheriff of LA County. As such, he was the chief policymaker for defendant LASD and is responsible for overseeing and implementing policies and practices followed by personnel in the LASD Data Systems Bureau. Baca is sued in his individual capacity only.

00118376.WPD

10. Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES, and therefore sues these defendants by fictitious names.  Plaintiff will give notice of their true names and capacities when ascertained.  Plaintiff is informed and believes and thereon alleges that defendant DOES are responsible in some manner for the damages and injuries hereinafter complained of.

11. The complained of acts and omissions were performed by persons within the course and scope of employment with their respective employers, Riverside County, RCSD, LA County, LASD. All acts and omissions were under color of state law.

12. For purposes of all state law claims, Plaintiff timely filed with LA County and Riverside County a claim for damages pursuant to Cal. Gov't Code § 910. These entities have denied the claim and this lawsuit is commenced within six months of the denial.

## IV.    FACTS COMMON TO ALL CLAIMS.

### A. Biometric Identifiers Matched To Fingerprints.

13. Years ago, law enforcement developed means to reliably identify a person to the exclusion of others who share the same or similar names, birthdates, physical characteristics, and the like. One such means was the assignment of an unique numerical identifier to a person matched to the person's fingerprints. Three such biometric identifiers are described below:

A. *CII numbers*. The California Department of Justice ("CDOJ") assigns a unique identifying number to every person booked into a California jail. This number, called a "CII number," is matched to the arrestee's fingerprints. Unless previously created, a CII number is generated upon a person's booking into any California jail; thereafter, the same CII number is used for every subsequent booking of that arrestee. CDOJ will record all subsequent bookings of that person under the same CII number even if the person uses different names, birthdates,

social security numbers, driver's license numbers etc. CDOJ can do so because a CII number is matched to the arrestee's fingerprints which, of course, are unique and unchanging. CII numbers are also assigned to persons who, for reasons of employment, must be fingerprinted and those prints reported to the CDOJ. For instance, all California lawyers, judges and police officers have CII numbers.

B. A major use of CII number is for generating its subject's criminal history, or "rap sheet," as maintained by the CDOJ. *People v. Martinez*, 22 Cal.4th 106, 121, 131 (2000) (example of how CII number was used to obtain a person's criminal history). The criminal history will reflect the subject's known full name, aliases, birthdate, residential addresses, the subject's unique identifiers, such as social security, driver's license and FBI number (described below), along with the subject's arrest, prosecution and conviction history, including sentences of incarceration in a county jail or state prison.

C. *FBI numbers.* An FBI number is essentially the same as a CII number only at the national level. The FBI assigns a criminal record, a unique number, to an individual whose arrest is reported to the FBI. Plaintiff is informed and believes and based thereon alleges that anyone convicted in California of a felony, has the fact of that conviction (date, charge, sentence, etc.) reported to the FBI. The FBI, plaintiffs are informed, tracks all felony convictions from any jurisdiction within the United States under a person's unique FBI number.

D. *LA Main numbers.* An LA Main number functions like a CII number, except that the LA Main number tracks only Los Angeles County bookings, prosecutions, convictions. As with CII numbers, LA Main numbers are supposed to be unique to an individual, based on the person's fingerprints. So no two persons should share the same LA Main number, just as no two persons should share the

same CII number.

14. Plaintiff is informed and believes and based thereon allege that a set of fingerprints is a more unique biometric identifier than DNA. That is, while identical twins share the same DNA profile, the twins will nevertheless have non-matching fingerprints.

15. Plaintiff is informed and believes and based thereon allege that law enforcement considers biometric identifiers like CII, FBI and LA Main numbers, to be far more reliable for identification purposes than matching name(s), birth date(s), and non-unique physical descriptors (sex, ethnicity, hair/eye color, etc.). Plaintiff is informed and believes and based thereon alleges that if law enforcement personnel observe that two different warrants identify their respective subjects by the same CII number, law enforcement will consider the two warrants to refer to the *same* person even though the warrants' other identifiers (names, birth dates and non-unique physical descriptors) do not match.

16. Plaintiff is informed and based thereon alleges that the facts stated above are well known to those in the law enforcement community. Law enforcement officials also know that CII, FBI and LA Main numbers are proxies for fingerprints. Hence, absent an breakdown or error in the system, two different CII numbers (or FBI numbers or LA Main numbers) means two different people.

**B. Livescan.**

17. Plaintiff is informed and believe that within a matter of a few minutes during the course of booking someone into jail, law enforcement agencies, including defendants herein, obtain a person's identification information and biometric identifiers. Law enforcement does so using a process called *Livescan*. When an arrestee is booked into a California jail, in lieu of manually "rolling" prints the jailer takes an electronic image of the arrestee's fingerprints. The arrestee's fingers are placed on an imaging machine's

glass plate; the image is then transmitted electronically to the CDOJ. Within a few minutes the CDOJ responds in one of two ways. If the arrestee's prints are already on file, the arrestee's CII number and associated identifiers, along with the arrestee's criminal history if requested, are sent to the arresting agency; if no match is made with existing fingerprints, the CDOJ assigns a newly created CII number and so informs the arresting agency.

### C. Warrant Databases.

18. Plaintiff is informed and believes and based thereon alleges that law enforcement uses local, state and national law enforcement databases to check for outstanding warrants on persons the police detained. These law enforcement warrant databases are designed to capture, if known, the warrant subject's CII, FBI and LA Main numbers. The CDOJ instructs California law enforcement agencies to include, if known, the warrant subject's CII, FBI and LA Main numbers. The databases are also designed to record information about persons wrongly arrested on warrants meant for another, and the CDOJ instructs California law enforcement agencies to record such information into the database.

### D. CWS (*C*ounty *W*arrant *S*ystem).

19. Plaintiff is informed and believes and based thereon alleges that since 1988, defendant LASD maintains a computer-based system called "*C*ounty *W*arrant *S*ystem" or "CWS." Since 1988, CWS is and has been the depository for all warrants issued by Los Angeles County courts, both unlimited and limited jurisdiction (and the Los Angeles Municipal Court before that court became a superior court).

20. When a Los Angeles court issues an order for an arrest warrant, the actual warrant exists in electronic form only. That is, the court does not issue, on paper, arrest warrants. Instead, taking the information from the court's order issuing the warrant, LA

County personnel input the information into various law enforcement databases, the first of which is CWS.

21. Plaintiff is informed and believes and based thereon alleges that CWS is designed to capture and make available to law enforcement agencies identification data on a warrant's subject, including but not limited to name, date of birth, ethnicity, height, weight, sex, eye and hair colors, and unique identifier numbers such as CII, FBI, LA Main, driver's license, and social security. Plaintiff is informed and believes and based thereon alleges that CWS is also designed to capture information showing that one or more individuals has been exonerated or cleared as being the warrant's intended subject, and that person can be identified by his unique biometric identifiers such as CII, FBI and LA Main numbers.

22. Plaintiff is informed and believes and based thereon alleges that whenever a government entity desires to determine if a detainee or arrestee is the subject of an outstanding warrant issued by a Los Angeles court, CWS is queried. Based upon information retrieved from CWS, the government entity will then determine if the person is or is not the warrant's subject. In the case of a Los Angeles County-based law enforcement agency that desires to determine if a person in its custody is the subject of a Los Angeles County warrant, the agency relies solely on CWS information. If the law enforcement agency is *not* a Los Angeles County agency, the agency contacts the Los Angeles County agency responsible for inputting into CWS the warrant and its descriptors. The Los Angeles County agency, which is usually though not always the LASD, then provides information it obtains from CWS to the outside agency. That agency then uses the information in determining if its detainee or arrestee is the subject of the Los Angeles County warrant. (Agencies outside of Los Angeles County are informed of possible warrants in CWS via a CDOJ system described in paragraphs 25-30,

*infra*.)

23. Plaintiff is informed and believes and based thereon alleges that when a Los Angeles court issues a bench warrant, the information about the warrant and its subject is forwarded by LA County personnel to LASD and its Data Systems Bureau. That Bureau is responsible for entry of the warrant data into CWS. The Bureau can also easily and within seconds include additional identifying information about a warrant's subject, even if the information is acquired after a warrant's original issuance. The LASD can also easily and quickly update CWS, after a warrant's original issuance, to show that a particular person has been identified as *not* the warrant's subject.

24. Plaintiff is informed and believes and based thereon alleges that if a "hard copy" or paper record of the CWS warrant is needed, it is supplied via either a "warrant information sheet" (aka "WIS") or a "warrant abstract." The WIS contains CWS information regarding the warrant's subject, descriptors, bail amount, court issuing the warrant, and so on. The warrant abstract is generated upon an agency's booking of an arrestee on the warrant. Once the warrant abstract is generated, CWS classifies the warrant as having been executed. That is, thereafter CWS will *not* list the warrant as being outstanding.

**E. WPS (Wanted Person System).**

25. Plaintiff is informed and believes and based thereon alleges that since 1971, CDOJ has maintained *Wanted Persons System* ("WPS"). WPS is a computer database containing records of arrest warrants issued by California courts. Its function is to alert California law enforcement agencies about possible arrest warrants issued from any California state court.

26. Plaintiff is informed and believes and based thereon alleges that a California law enforcement agency uses WPS to locate warrants issued by a California court in a

county outside the county in which the agency is based. That is, for warrants issued from a court in a county other than Riverside, a Riverside County based law enforcement agency uses WPS.

27. Plaintiff is informed and believes and based thereon alleges that a law enforcement agency queries WPS "by using a subject's name and physical descriptors or by using numeric identifiers." Examples of numeric identifiers are social security number, driver's license number, FBI number and/or CII number.

28. Plaintiff is informed and believes and based thereon alleges that the CDOJ has instructed and trained California law enforcement agencies that "[a] match made on a WPS record *does not*, by itself, *provide sufficient grounds to arrest a person*"; instead, the agency that is detaining a person based on information obtained via WPS that the person may be the subject of a warrant, must contact the agency responsible for entry of the warrant information into WPS (the "originating agency"), to confirm the existence of the warrant and its application to an arrestee. The originating agency, in turn, "must respond to a confirmation request within 10 minutes on a 24-hour basis."

29. Plaintiff is informed and believes and based thereon alleges that the CDOJ instructs California law enforcement agencies that when an originating agency knows the warrant subject's unique numeric descriptors – driver's license number, social security number, FBI number, and/or CII number – the agency should input these identifiers into WPS. CDOJ so instructs, Plaintiff is informed, because inputting these identifiers will substantially reduce the likelihood that the wrong person will be detained or arrested on the warrant while inputting the data takes but a few seconds of additional keystrokes.

30. Plaintiff is informed and believes and based thereon alleges that since two or more persons may share the same (or similar) names, birth dates and physical descriptors, CDOJ instructs California law enforcement agencies that when a hit is made in WPS, a

00118376.WPD

positive identification of the arrestee with the warrant's subject "must be accomplished through the exchange of fingerprint facsimiles and other descriptors during the confirmation discussions between the WPS record contributor [*i.e.,* originating agency] and the holding [*i.e.,* arresting] agency."

**F. Criminal Histories.**

31. Plaintiff is informed and believes and based thereon alleges that pursuant to California law, any person who has been charged with a felony crime and who was (a) booked on that felony charge *or* (b) appeared in court response to that charge, will have been fingerprinted. Furthermore, Plaintiff is informed and believes and based thereon alleges that pursuant to California law, the person's fingerprints will have been forwarded to CDOJ so that CDOJ can and will record, under the person's CII number matched to his fingerprints, the fact of the booking on that felony charge. In other words, the felony booking will be reflected on that person's CDOJ criminal history as verified by his fingerprints.

32. Plaintiff is informed and believes and based thereon alleges that law enforcement officials also know that if a person is arrested on a felony bench warrant issued by a California court, if the person is in fact the true subject of the felony warrant, at a minimum there should be on the person's CDOJ criminal history the fact of an earlier booking on the felony charge. Consequently, if the CDOJ criminal history reflects *no* felony booking consistent with the felony bench warrant, law enforcement officials know or should know the absence of the prior felony booking is prima facie evidence that the warrant's subject must be someone else.

33. Plaintiff is also informed and believes and based thereon alleges that the warrant subject's CDOJ criminal history ordinarily reflects the underlying prosecution that led to the warrant's issuance; if the history does not reflect such

-10-

prosecution, it is highly likely that the arrestee is *not* the person the warrant seeks.

## V.    CLASS ACTION ALLEGATIONS.

34. Plaintiff brings this action on his own behalf, and on behalf of the class of all other persons similarly situated, pursuant to Rule 23, Federal Rules of Civil Procedure.

35. There is a "Wrongful Incarceration Class" under F.R.Cv.Proc. 23(b)(3), defined as follows:

A. Booked into an LASD jail at any time on or after November 26, 2010, through the present, based on one or more Los Angeles court bench warrants entered in CWS; *and*

B. Was released because it was determined that the person was not the subject of the CWS warrant(s); *and*

C. LASD personnel had actual knowledge that the warrant subject's CII number did not match to the CII number of the person booked on the warrant *or* LASD personnel had actual knowledge that the warrant subject's LA Main number did not match to the LA Main number of the person booked on the warrant

36. Plaintiff is informed and believes and based thereon alleges that member identities of the Class are readily ascertainable from computer records kept by LA County and LASD defendants. These computer records identify as "wrong defendants" persons who were released from custody because it was determined that they were not the subject of warrants on which they were incarcerated. LA County and LASD records will also establish, Plaintiff is informed, these defendants' actual knowledge of the warrant subject's CII number and the class members' CII numbers, as well as other fingerprint-matched identifiers.

37. Plaintiff is informed and believes and based thereon alleges that the class defined herein numbers in the hundreds if not thousands. Plaintiff is informed and

00118376.WPD

believes and based thereon alleges that nearly two persons are released each day from LASD custody because it is determined that they were being wrongly incarcerated on warrants meant for other persons.

38. There are common questions of law and fact that predominate over the questions affecting only individual class members. Those common questions include:

A. Whether defendants must include on a warrant, when it is actually known, the warrant subject's unique fingerprint-based identifiers that describe him or her to the exclusion of all other persons?

B. Whether defendants are charged with the knowledge of their own records which indicate, via gross and irreconcilable discrepancies, that a warrant arrestee's unique, fingerprint-based identifiers do not match those of the subject described on the warrant?

C. Whether probable cause exists to believe that an arrestee is the subject of a warrant when defendants know or should know that the warrant arrestee's unique fingerprint-based identifiers do not match those of the warrant's subject?

D. Whether the governing legal standard for the incarceration on a warrant is the Fourth Amendment in the absence of a judicial determination that the arrestee is the subject of the warrant, see *West v. Cabell*, 153 U.S. 78, 87 (1894)?

E. Whether defendants , in a state with a population of over 36 million with many thousands sharing the same or similar names, birthdates, physical descriptors, must train their personnel to (1) include on warrants the subject's unique, fingerprint-based descriptors when known or reasonably ascertainable, (2) compare an arrestee's fingerprint-based descriptors with those of the warrant's subject, and (3) review other routinely generated and readily available official law enforcement records (e.g., criminal histories aka "rap sheets") which will rule in

or rule out the arrestee's status as the warrant's subject?

39. In accordance with F.R.Cv.Proc. 23(b)(1)(A), prosecutions of separate actions by individual members of each class would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

40. In accordance with F.R.Cv.Proc. 23(b)(1)(B), prosecutions of separate actions by individual members of each class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

41. Plaintiff's claims are based upon the same legal theories as the claims of the class members he represents. Moreover, Plaintiff suffered actual damages as a result of being wrongly arrested on a warrant meant for another The actual damages suffered by this representative plaintiff – wrongful incarceration – are similar in type and amount to the actual damages suffered by each member of each class.

42. As against Plaintiff's claims, defendants justify their actions on grounds generally applicable to Plaintiff and all members of both proposed classes, to wit: defendants are not obligated to record warrant subjects' unique fingerprint-based identifiers on CWS warrants, or input such information into law enforcement databases tracking those warrants; defendants are not obligated to record, in association with a CWS warrant, official information exonerating the arrestee as the subject of the warrant; law enforcement personnel need not consider and may ignore non-matching fingerprint-based identifiers once they learn that an arrestee's name and/or birth date and/or physical descriptors match or are similar to those listed for the warrant's subject; defendants are not held to a Fourth Amendment standard in determining if an arrestee is the warrant's subject, but instead are judged under a harder-to-satisfy (for plaintiffs) due process

standard, see *Baker v. McCollan*, 443 U.S. 137 (1979); defendants have absolute and/or qualified immunity under various provisions of federal and/or state law.

## VI.   FACTS RE PLAINTIFF'S ARREST/INCARCERATION.

43. On November 18, 1994, in *People v. Mario Loya Garcia*, LA Superior Court No. BA096224-01, the court issued a no-bail felony bench warrant for the arrest of one Mario Loya Garcia ("suspect Garcia") who is *not* the Plaintiff. The warrant charged violations of Cal. Health & Safety Code § 11351 (possession for sale) and Cal. Penal Code § 1203.2 (violation of probation). Per the procedure described above, LA County personnel created a bench warrant record in CWS. LA County personnel also created an entry in WPS alerting agencies outside of Los Angeles County to the existence of the suspect Garcia warrant.

44. Plaintiff is informed and believes and based thereon alleges that at the time of the creation of the suspect Garcia warrant, LA County personnel had actual knowledge of suspect Garcia's CII and LA Main numbers, and that his name was "Mario *Loya* Garcia." But in creating the CWS warrant for suspect Garcia and in creating the WPS entry for the warrant, LA County personnel did *not* input into either data systems, the suspect's full name or either of his known LA Main and CII numbers. Instead, LA County personnel described suspect Garcia as only "Mario Garcia," along with the non-unique descriptors of his 1962 birth date (including the month and day), 5'1" / 130lb male Hispanic. See **Exhibit A**, true copy of the CWS warrant abstract for suspect Garcia's warrant (no. LABA096224-01).[1]

45. Early Monday morning, November 26, 2012, a City of Banning police officer

---

[1] For confidentiality reasons, the month and day of the suspect's 1962 birth date is redacted. However, the month, day and year of suspect Garcia's birth date matches Plaintiff's 1962 birth date.

00118376.WPD

stopped Plaintiff as he was driving his truck. The officer arrested Plaintiff for driving under the influence. Plaintiff was booked into the Banning police department jail on misdemeanor charges of violating Cal. Veh. Code § 23152(a) & (b).

46. That same morning, Banning officials transported Plaintiff to the RCSD jail. Had Plaintiff been booked into the RCSD jail on only the Cal. Veh. Code § 21352 charges, Plaintiff is informed and believes and based thereon alleges he would have been released that day, pursuant to RCSD procedure and state law. However, during the course of booking Plaintiff into the RCSD jail, Plaintiff is informed and believes and based thereon alleges RCSD personnel queried WPS and were alerted to the no-bail felony bench warrant for suspect Garcia. Thereafter, Plaintiff is informed and believes and based thereon alleges that RCSD personnel contacted LASD personnel who provided the following descriptors for the warrant's subject:

Warrant Type: Felony Bench;

Warrant Charge: Cal. Health & Safety Code § 11351 (possession for sale) & Cal. Penal Code § 1203.2 (Probation violation);

Warrant Subject's Name (first and last only): Maria Garcia;

Subject's Birth date: 1962 (same month and day as Plaintiff's);

Subject's Height/Weight: 5'1" / 130 lbs.;

47. Even though LASD personnel had actual knowledge of suspect Garcia's fingerprint-matched identifiers LA Main and CII numbers and suspect Garcia's full name, LASD personnel did *not* forward that information to RCSD personnel.

48. Notwithstanding CDOJ instructions described in paragraphs 28-30 above, Plaintiff is informed and believes and based thereon alleges that in the discussions between personnel of RCSD and LASD regarding the suspect Garcia warrant, there was no positive identification of Plaintiff as the warrant's subject, nor was an identification

00118376.WPD

made through the exchange of fingerprint facsimiles and other descriptors.

49. Upon RCSD personnel informing Plaintiff he would be booked on the no-bail felony warrant, Plaintiff complained repeatedly that the warrant was not his, that he had been detained before on this warrant, that the warrant was for a different person. Per RCSD custom and practice the personnel ignored Plaintiff's complaints and booked him into the RCSD jail on the no-bail felony warrant for suspect Garcia.

50. RCSD personnel knew or should have known that Plaintiff was not and could not be the subject of the no-bail felony warrant because:

A. Plaintiff is 5'10" and weighed 170 lbs., whereas suspect Garcia is *nine* inches shorter (5'1") and *forty* pounds lighter (130 lbs);

B. From the warrant information recorded in CWS, RCSD personnel knew that the criminal history for suspect Garcia includes both a felony booking *and* felony conviction. RCSD would know this because the warrant included a probation violation charge (Cal. Penal Code § 1203.2), thus establishing that the warrant's subject had been *convicted* of the warrant's felony charge (you cannot be on probation unless you have been convicted).  It would have taken RCSD personnel but *seconds* to generate Plaintiff's criminal history using his CII number A24141315 that RCSD personnel knew was Plaintiff's CII number.  Had RCSD personnel generated Plaintiff's criminal history matched to his fingerprints, that history would have reflected Plaintiff had *never* been booked on a felony, let alone convicted of a felony. The history would also show that Plaintiff's only arrest/conviction history was a March-April 2009 arrest and conviction in Los Angeles County for misdemeanor DUI (Cal. Veh. Code § 23152(a) & (b)). In short, Plaintiff's fingerprint-verified criminal history establishes he was not and could not be the subject of the suspect Garcia no-bail felony  warrant.

51. On November 27, 2012, LASD personnel took custody of Plaintiff and booked him into the LA County jail based solely on Plaintiff supposedly being the subject of suspect Garcia's no-bail felony warrant. At the time of booking Plaintiff into the LA County jail, Plaintiff complained repeatedly to LASD personnel that he was not the subject of the suspect Garcia warrant. Per long-standing LASD custom and practice, LASD personnel ignored his complaints.

52. LASD personnel should have known that Plaintiff was not and could not be the subject of the suspect Garcia's warrant:

A. LASD personnel knew that Plaintiff's name is Mario *Alberto* Garcia whereas LASD personnel knew that the name of suspect Garcia was Mario *Loya* Garcia;

B. LASD personnel knew that Plaintiff is 5'10" and weighed 170 lbs., whereas suspect Garcia is 5'1" and 130 lbs.;

C. LASD personnel knew that Plaintiff's fingerprint-matched CII and LA Main numbers did *not* match to the CII and LA Main numbers for suspect Garcia, thus constituting prima facie proof that Plaintiff's fingerprints did not match to the suspect Garcia's fingerprints.

53. Additionally, LASD should have known, just as RCSD personnel should have known, that Plaintiff's criminal history matched to his fingerprints excluded him as the subject of the suspect Garcia warrant. However, Plaintiff is informed and believes and based thereon alleges that it is a long-standing LASD practice to *ignore* CII numbers for purposes of verifying whether or not an arrestee is the person described as the warrant's subject. That is, even if the warrant identifies its subject by the subject's CII number, and even though LASD is informed that the arrestee's CII number is different as verified by the arrestee's fingerprints, LASD personnel routinely disregard the significance of the

00118376.WPD

non-matching CII numbers because, per LASD practice, CII numbers play no role in the booking of prisoners into the LASD jail.

54. Plaintiff is informed and believes and based thereon alleges that LASD personnel booked Plaintiff on the suspect Garcia warrant despite the evidence, both known and readily available, establishing Plaintiff was *not* the warrant's subject, because it is the long-standing LASD practice to regularly ignore prisoners' complaints they are being held on warrants meant for another, and instead to accept an outside agency's determination that an arrestee is the warrant's subject even though LASD personnel know or should know that the arrestee cannot be the warrant's intended subject.

55. Plaintiff is informed and based thereon alleges that while LASD claims it does not routinely ignore a prisoner's complaint that he is being incarcered based on another person's warrant, in fact LASD personnel routinely ignore that fact which LASD's own records confirm:

A. Plaintiff is informed and based thereon alleges that numerous individuals have testified they complained to LASD personnel that they were being imprisoned on someone else's warrant but that LASD personnel ignored their complaints.

B. Plaintiff is informed and based thereon alleges that in the last five years, LASD records show that as many as 2,000 prisoners were, in fact, wrongly jailed on warrants meant for others. The LASD has claimed that more than 99% of these wrongly imprisoned persons *never* complained to LASD personnel they were being wrongly incarcerated on another person's warrant. Plaintiff submits that because it is reasonable to assume that a person who sincerely believes he is being incarcerated on another person's warrant is likely to make that complaint to his jailer, the LASD claim that more than 99% of the prisoners wrongly incarcerated never so complained is patently false.

-18-

56. Plaintiff is informed and based thereon alleges that for years defendant Baca was aware that the LASD was routinely imprisoning innocent people on warrants describing different persons yet Baca took no steps to remedy the situation. Plaintiff is further informed and believes and based thereon alleges that it was not until the *Los Angeles Times* published on December 25, 2011 (**Exhibit B**) the number of persons wrongly incarcerated in the LA County jail did Baca bother to take notice of the problem. Plaintiff is further informed and based thereon alleges that the task force Baca directed to address the problem, ignored the primary cause of the wrongful incarcerations to wit, the refusal of LASD personnel to make use of the readily available and reliable official law enforcement identifiers and other information described above.

57. Regarding defendant Baca's deliberate indifference to the fact of routine wrongful incarcerations, Plaintiff alleges that after the *Los Angeles Times* published its findings of nearly 1,500 wrongful incarceration in the last five years (**Exhibit B**) Plaintiff is informed that Baca became alarmed over the public's reaction to the *Times*' findings. In particular, Baca sought to cover up the problem of grossly deficient LA County jail management practices. Baca did so by announcing the creation of a task force that, contrary to Baca's public statements, would provide a "public relations" cover serving to project an image of Baca as a policy-maker genuinely interested in remedying deficient jail practices. When Baca announced the formation of the task force (see **Exhibit C**[2]), Plaintiff is informed that Baca did not expect the task force to accomplish any meaningful analysis of the problem, nor did he expect the task force would propose any changes or modifications of existing LASD jail practices. In short, the task force as publicly described by Baca was a sham. This was made evident as follows:

_____

[2] Baca has testified that statements attributed to him in the *Los Angeles Times* article are, in fact, statements he made.

A. Other than Baca's public pronouncements of the task force's creation and its purported objective, there is *no* LASD or County prepared record that this task was ever formed, let alone any record showing that the task force actually did anything associated with its publicly-declared purpose (as stated by Baca to the *Los Angeles Times*, see **Exhibit C**);

B. Baca did not expect nor did he direct the task force to prepare any kind of record of its investigation, analysis, conclusion(s), and/or recommendations. The task force did not, in fact, prepare any record of its investigation, analysis, conclusion(s), and/or recommendations.

C. When Baca created the task force, he did not expect nor did he direct that the task force report back to him on the results of its purported investigation. Moreover, Plaintiff is informed that Baca did not expect nor did he direct the task force report to *anyone* in the LASD's chain of command, the task force's findings, conclusions and/or recommendations. In fact, at the conclusion of its purported mission (as publicly declared by Baca), the task force made no report to anyone of its investigation, analysis, conclusions and/or recommendations.

D. After creating the task force, at no time did Baca ever inquire of anyone regarding the task force he created, its conclusions and/or recommendations. Plaintiff is informed the reason Baca made no inquiry is that from the moment he created the task force Baca intended that its true mission was, contrary to Baca's public pronouncements (see **Exhibit C**), a public relations cover. That is, Baca created the task force for the sole purpose of deflecting criticisms of LASD jail practices while projecting an image of Baca as a Sheriff who cared about remedying LASD jail problems when, in fact, he had no interest in doing so.

///

-20-

00118376.WPD

**FIRST CAUSE OF ACTION**

**(42 U.S.C. § 1983 – Wrongful Incarceration/Fourth Amendment)**

(Plaintiff, individually and as class representative,

against defendants LA County, Baca and Does)

58. Plaintiff restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein.

59. Plaintiff brings this cause of action on his own behalf and in his representative capacity for the Wrongful Incarceration Class.

60. The imprisonments of Plaintiff and Wrongful Incarceration Class members on warrants meant for others, violated their Fourth Amendment rights in that as alleged above, official and reliable law enforcement information, including reliable fingerprint-matched identifiers and other information to which had or which they had easy access with virtually no appreciable effort or cost, excluded Plaintiff and class members as the subjects of the warrants on which they were incarcerated. Therefore, Plaintiff and the class he represents are entitled to recover damages for the wrongful imprisonments.

61. Defendants LA County, Baca and Does are liable because the wrongful acts were pursuant to policies, practices and/or customs described above, approved and/or ratified by Baca.

62. Plaintiff is alleging a Fourth Amendment violation based on the recently decided *Manuel v. City of Joliet, Illinois*, 580 U.S. ___, 137 S.Ct. 911 (2017) (filed 3/21/17). In *Manuel*, the Supreme Court held that the *entirety* of a person's wrongful pretrial detention may be challenged under the Fourth Amendment, *i.e.,* that amendment's protections do not cease once legal process before court commences: "[P]retrial detention can violate the Fourth Amendment not only when it precedes, but also when it follows, the start of legal process in a criminal case." "Our holding [is] the Fourth Amendment

00118376.WPD

governs a claim for unlawful pretrial detention even beyond the start of legal process . . ." 137 S.Ct. at 918, 920.

## SECOND CAUSE OF ACTION

### (42 U.S.C. § 1983 – Wrongful Incarceration/Fourteenth Amendment)

(Plaintiff, individually and as class representative,

against defendants LA County, Baca and Does)

63. Plaintiff restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein.

64. Plaintiff brings this cause of action on his own behalf and in his representative capacity for the Wrongful Incarceration Class.

65. The imprisonments of Plaintiff and Wrongful Incarceration Class members on warrants meant for others, violated their Fourteenth Amendment rights in that as alleged above, official and reliable law enforcement information, including reliable fingerprint-matched identifiers and other information to which had or which they had easy access with virtually no appreciable effort or cost, excluded Plaintiff and class members as the subjects of the warrants on which they were incarcerated. Therefore, Plaintiff and the class he represents are entitled to recover damages for the wrongful imprisonments.

66. Defendants LA County, Baca and Does are liable because the wrongful acts were pursuant to policies, practices and/or customs described above, approved and/or ratified by Baca.

///

///

///

///

///

00118376.WPD

**THIRD CAUSE OF ACTION**

**(Cal. Const., Art. I § 13 – Wrongful Incarceration)**

(Plaintiff, individually and as class representative,

against defendant LA County)

67. Plaintiff restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein.

68. Plaintiff brings this cause of action on his own behalf and in his representative capacity for the Wrongful Incarceration Class.

69. The imprisonments of Plaintiff and the class members on warrants meant for others, violated their rights protected under Art. I § 13 of the California Constitution, in that as alleged above, official and reliable law enforcement information, including reliable fingerprint-matched identifiers and other information to which had or which they had easy access with virtually no appreciable effort or cost, excluded Plaintiff and class members as the subjects of the warrants on which they were incarcerated. Therefore, Plaintiff and the class he represents are entitled to recover damages for the wrongful imprisonments.

70. Defendant LA County is liable for the wrongful acts under Cal. Gov't Code § 815.2(a).

**FOURTH CAUSE OF ACTION**

**(False Imprisonment)**

(Plaintiff, individually and as class representative,

against defendant LA County)

71. Plaintiff restates and incorporates by reference the foregoing paragraphs as if each paragraph was fully set forth herein.

72. Plaintiff brings this cause of action on his own behalf and in his representative

-23-

capacity for the Wrongful Incarceration Class.

73. The wrongful imprisonments of Plaintiff and the Class on warrants meant for others, constituted false imprisonment, thereby entitling Plaintiff and the Class members to recover compensatory damages for their wrongful imprisonments. *Sullivan v. County of Los Angeles*, 12 Cal.3d 710 (1974).

**PRAYER**

WHEREFORE, Plaintiff prays judgment as follows:

**On the First through Fourth Causes of Action:**

74. That the Court certify these claims pursuant to F. R. Civ. P. 23(b)(3) as a class action on behalf of a class of Plaintiffs composed of all persons described in paragraph 37, *supra*;

75. That Plaintiff and Class members be awarded compensatory damages according to proof for their wrongful incarcerations;

76. That as against individually-named defendants, Plaintiff and Class members be awarded punitive damages according to proof;

77. Attorneys' fees under 42 U.S.C. § 1988, Cal. Civ. Proc. Code § 1021.5, and California's private attorney general doctrine;

**On All Causes of Action:**

78. Costs of suit; and

79. Such other relief as the Court deems proper.

DATED: May 15, 2017

**DONALD W. COOK**<br>Attorney for Plaintiff

By_____
Donald W. Cook

-24-

00118376.WPD

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself individually and on behalf of the class he represents, a jury trial.

DATED: May 15, 2017

**DONALD W. COOK**
Attorney for Plaintiff

By_____
Donald W. Cook

-25-

00118376.WPD

```
Tiburon, Inc.                MESSAGE FROM CLETS                    11/26/12
                    RIVERSIDE COUNTY SHERIFF'S DEPT.               10:14
*********************************************************************
1WRL0U12V.RJF0.RJF0.
MSG: 001
*******************CWS WARRANT-ABSTRACT*****************************
* BOOKING AGENCY:  CA0330050                        10:15 - 11/26/12 *
* BOOKING DATE: 11/26/12         BOOKING NUMBER: 201251742          *
* LASD REPOSITORY OR THE COURT HOLDS:                               *
* SURNAME GARCIA         FIRST MARIO        MIDDLE        SUFFIX     *
* RES. ADDR:  TRANSIENT                                             *
* DESCRIPTION  M H  D.O.B.      '62 501 130 BLK BRO                 *
* FELONY              BENCH     WARRANT                             *
* WARRANT NUMBER LABA09622401                                       *
* BAIL       $0.00                                                  *
* VIOLATION 11351/HS           1203.2/PC                            *
*                                                                   *
* DATE ISSUED 11/18/94 FILG AGY FUGITIVE        PHONE ( 562 ) 3454457 *
* COURT FOLTZ CRIM JST CTR   DEPT 116                               *
* JUDGE REID JOHN H                                                 *
*                                                                   *
* OFFICER HAZARDS                                                   *
* MISC DESCRIPTORS                                                  *
* OLN          CII  00000000 SSN        VLN       MAIN 00000000     *
* ORIGINATING AGENCY REPORT NO:                                     *
* BAIL STATUS NO BAIL                                               *
*           THIS ABSTRACT IS SUFFICIENT FOR BOOKING PURPOSES        *
*                                                                   *
* IF ASSISTANCE NEEDED CALL LASD WARR/REPOSITORY 562-345-4457. NOTIFY LASD/ *
* TRANSPORTATION BY CLETS MSG C1P0 WHEN SUSPECT READY FOR PICK UP   *
```





**Suspect Garcia warrant**

**EXHIBIT A**

latimes.com/news/local/la-me-wrong-id-20111225,0,7157038.story

# latimes.com

## ID errors put hundreds in L.A. County jails

### Wrongful incarcerations totaled 1,480 in the last five years, a Times inquiry finds.

By Robert Faturechi and Jack Leonard, Los Angeles Times

December 25, 2011

advertisement

Hundreds of people have been wrongly imprisoned inside the Los Angeles County Sheriff's Department jails in recent years, with some spending weeks behind bars before authorities realized those arrested were mistaken for wanted criminals, a Times investigation has found.

The wrongful incarcerations occurred more than 1,480 times in the last five years. They were the result of a variety of factors, including officials' overlooking fingerprint evidence and working off incomplete records.

The errors are so common that in some years people were jailed because of mistaken identity an average of once a day.

**FULL COVERAGE: Jails under scrutiny**

Many of those wrongly held inside the county's lockups had the same names as criminals or had their identities stolen — problems that took days or weeks for authorities to sort out.

In one case, a mechanic held for nine days in 1989 on a warrant meant for someone else was detained again 20 years later on the same warrant. He was jailed for more than a month the second time before the error was discovered.

In another instance, a Nissan customer service supervisor was hauled by authorities from Tennessee to L.A. County on a local sex-crimes warrant meant for someone with a similar name.

In a third case, a former construction worker mistaken for a wanted drug offender said he was assaulted by inmates and ignored by jailers.

"I'm with criminals, and I was a criminal to them," said Jose Ventura, 53, who had never been arrested before.

The problems continue because of a breakdown not just by jail officials but by police who arrest the wrong people and by the courts, which have issued warrants that did not precisely identify the right people.

Sheriff's officials said they make every effort to avoid detaining the wrong suspects. They pointed out that the number of people wrongly identified as wanted criminals makes up a tiny fraction of the 15,000 inmates in

**LA Times 12/25/11 Article**            **-27-**            **EXHIBIT B**

the county's jails at any given time. The Sheriff's Department produced the tally of people who were jailed because of misidentification in response to a Times Public Records Act request.

The errors occur in jails up and down the state, and many of the misidentified inmates in the L.A. County sheriff's jails were arrested by law enforcement agencies outside the county.

In California, criminals are assigned a unique nine-digit number matched to their fingerprints. Some warrants issued by judges fail to include those identifiers, making it more difficult for police and jailers to determine whether they have the right suspect.

When those fingerprint numbers are included, police agencies sometimes fail to determine why the arrested person has a different number or no number at all. In those cases, authorities could catch the error by obtaining the wanted criminal's fingerprints from the state Department of Justice and comparing them with those of the person in custody.

"It's bureaucratic sloth and indifference," said attorney Donald W. Cook, who has represented more than a dozen clients mistakenly held on warrants issued for other people. "They don't want to take the heat for letting someone go who a cop has decided, no matter how tentatively, is the subject of a warrant."

Those mistakenly arrested told The Times that they were ignored when they pleaded with police and jail staff about their innocence. In the county jails, the Sheriff's Department has a policy to launch investigations when inmates protest during booking that they are not the wanted people. But records show the department conducted investigations for only a small fraction of the number of people who courts eventually ruled were not the right suspects.

Sheriff's officials said they are bombarded with false innocence claims from inmates. It would be impossible to check every claim, they said, and jailers' authority to release an inmate ordered detained by a judge is limited.

"People lie to us about who they are all the time," said sheriff's Cmdr. David Fender.

Victims of mistaken identification typically go through several rounds of checks before they land in L.A. County Jail. Arresting officers use the name, birth date and driver's license number of the person they stop to check for warrants. The first fingerprint check is usually done when officers bring the people they arrest to the police station where they are booked. From there, inmates are taken either to court or directly to county jail.

Once inmates arrive at the jail, officials there review the fingerprints again and compare what's on a warrant to the personal information for the inmate. But sheriff's officials maintain that their top priority is to hold people awaiting court hearings rather than questioning the validity of the arrests.

"It's not our position or authority to check the work of every police agency in the county," said sheriff's Capt. Mike Parker.

The number of mistaken identifications has been declining, but the department is still on pace to record nearly 200 wrongful detentions this year. For those who are jailed, the experience can be harrowing.

Ventura, the former construction worker, was pulled over on a traffic stop by Chino police and arrested on a warrant meant for someone else. Jailers stripped him and escorted him to a large shower area when he arrived at the L.A. County Jail.

**LA Times 12/25/11 Article**      **-28-**      **EXHIBIT B**

Another inmate, he said, pushed him over so he could use Ventura's shower, leaving Ventura naked on the ground with back pain. Later, another inmate snatched his pair of jail-issued shoes and forced Ventura to apologize.

"Psychologically, I was already dead," he said.

Two days later, Ventura, a member of the Seventh-day Adventist Church, arrived in court. He preached to other inmates in his holding cell as they waited for their hearings.

Once in court, Ventura, a native of El Salvador, watched as his lawyer told a judge that police had arrested the wrong man. The 1994 warrant was for a Mexican national accused of drug possession at a time when Ventura's passport showed he wasn't even in the country, the attorney said. A Los Angeles Police Department official brought the actual suspect's fingerprints to court and concluded that Ventura was the wrong person.

"Mr. Ventura, our apologies," a judge told him as he ordered Ventura released. "Good luck."

Once released, those arrested have little recourse. State and federal laws generally protect law enforcement agencies from lawsuits over such detentions as long as officers were acting on a valid warrant and had a reasonable belief that they were arresting the right person.

Sheriff's deputies pulled over Phillip Reed, a South L.A. youth sports coach, who was on his way home from the grocery store in 2009.

A warrant listed Reed's name, date of birth and driver's license number, but Reed knew he was the wrong man. His younger brother, Marcus, had used Phillip's identity in the past, Reed said in a deposition. Reed had previously obtained a court document showing that another warrant had wrongly named him before.

He said he presented the document to the deputies who pulled him over — a claim that one of the arresting deputies later disputed. Authorities booked Reed even though the person listed on the warrant had a unique fingerprint number and Reed had no number.

That night, inside a county holding cell, Reed said he begged deputies to look inside his wallet, where he kept the judge's form.

In the corner of his cell, Reed recalled in an interview, he began to weep and pray: "I know this is not me. I don't know what else to do. God help me."

It wasn't until the next day that authorities discovered the error and released Reed.

In some cases, warrants contain only names, dates of birth and basic physical descriptions that can apply to multiple people. Many times, officers will encounter people who match most if not all of those details.

In 1989, Santiago Ibarra Rivera spent a week in jail before officials figured out that he was not the man wanted on a warrant for a deadly drunk driving accident. Rivera had no criminal record but shared a similar name and the same birthday as the man for which the warrant was meant.

When he was freed, authorities gave Rivera a court document showing that he had been exonerated. Years later, he lost the record when his wallet was stolen.

The warrant became a distant memory until March 2009, when San Bernardino County sheriff's deputies stopped Rivera while he was riding in a co-worker's car that was missing a front license plate. Deputies ran his

name and the warrant appeared.

Rivera pleaded that he wasn't the wanted man and that he'd been wrongly jailed for the warrant once before. He told one of the deputies that he had other court papers at his home to prove it. But the deputies, he said, refused to stop there. According to one of the arresting deputies, Rivera's knowledge of the warrant only served to make him appear guilty.

Rivera said he complained first in San Bernardino County Jail and later in L.A. County Jail, where he was transferred, but was ignored in both lockups.

A review of Rivera's criminal history based on his fingerprints, readily available in law enforcement databases, would have showed that in 1989 he had been arrested and exonerated on a vehicular manslaughter case.

The old court file that contained the real suspect's fingerprints was in the court archives. Rivera languished behind bars as officials searched for them. He implored officials to find his records "as soon as possible because I have to return to my work."

When it was eventually confirmed that Rivera was the wrong person, Superior Court Judge Kathryn Solorzano apologized. "Mr. Rivera, I'm very sorry. I don't know how many days…"

"I think close to a month," Rivera's attorney interrupted, according to a transcript.

"That's terrible," the judge said.

*robert.faturechi@latimes.com*

*jack.leonard@latimes.com*

Copyright © 2011, Los Angeles Times

Sign In  or  Sign Up        Like  168k        Subscribe/Manage Account    Place Ad    LAT Store    Jobs    Cars    Real Estate    Rentals    Classifieds    Custom Publishing

# Los Angeles Times | LOCAL



LOCAL    U.S.    WORLD    BUSINESS    SPORTS    ENTERTAINMENT    HEALTH    LIVING    TRAVEL    OPINION    DEALS        WEEKLY AD

L.A. NOW    POLITICS    CRIME    EDUCATION    O.C.    WESTSIDE    NEIGHBORHOODS    ENVIRONMENT    OBITUARIES    FINDLOCAL

IN THE NEWS:    MEGA MILLIONS    DANNY GOKEY    STRAIT OF HORMUZ    CHRISSY TEIGEN    PRO BOWL    BILL MAHER        Search



## Sheriff Lee Baca to create task force to address wrongful jailings

The L.A. County sheriff's move comes in response to a Los Angeles Times investigation that found that wrongful incarcerations occurred more than 1,480 times in the last five years.

 Comments  40    Share  67    1    Tweet  27    Recommend  38



L.A. County Sheriff Lee Baca said in an interview that the wrongful arrest of innocent people is "a horrible reality of what is basically the imperfect nature of the criminal justice system. (Francine Orr / Los Angeles Times / November 9, 2011)

**ALSO**



ID errors put hundreds in L.A. County jails

By Robert Faturechi and Jack Leonard, Los Angeles Times
*December 28, 2011*

Los Angeles County Sheriff Lee Baca said Tuesday that he will create a task force to minimize the wrongful jailings of people mistaken for someone else.

Baca's move came in response to a Times investigation that found hundreds of people have been wrongly imprisoned in recent years, with some spending weeks behind bars before authorities realized their true identities.

"It's a horrible reality of what is basically the imperfect nature of the criminal justice system," Baca said in an interview. "No

Recommended on Facebook    Like  168k

Login   You need to be logged into Facebook to see your friends' recommendations.

Texas teen dies on Christmas, leaves online message [video]
944 people recommend this.

Tucson's ethnic-studies program violates Arizona law, judge rules

advertisement





Death squads hunt U.S. drone informants

**Photos:** Celebrity homes on the market

Boy home alone thwarts burglars in Fullerton

UC, professor charged in fatal lab fire

**LA Times 12/28/11 Article**    **-31-**    **EXHIBIT C**

California's county jails struggle to house influx of state prisoners



D.A. in the dark on jail probes



Archbishop, bearing Christmas gifts, visits Men's Central Jail





**Full coverage:** Jails under scrutiny

Ads by Google



one who is an innocent person should ever be tied in with the criminal justice system....There's a difference between saying 'I plead not guilty.' It's another thing to say to anybody 'I'm not that person.'"

Baca said his task force to minimize the problem will probably be headed up by his detectives chief, a patrol commander and a jail captain.

The wrongful incarcerations occurred more than 1,480 times in the last five years. Many of those mistakenly held inside the county's lockups had the same names as suspects or had their identities stolen.

L.A. County Supervisor Mark Ridley-Thomas called the jailings "a travesty of justice" and another blow to the sheriff's jails, which are under federal investigation over allegations of inmate abuse and other deputy misconduct.

This "further erodes confidence in the County jail system — just as we are struggling to restore public confidence," he said in a statement. "It's not enough to say that accidents happen."

The Times found that the jailings occur because of breakdowns not just by jail officials but by police who arrest the wrong people and by the courts, which have issued warrants that did not precisely identify the right suspects.

Because multiple jurisdictions are involved, Baca said his task force would present its recommendations to other local police agencies, with the hope that they too would adopt the reforms.

"I'm looking at how do we really get to a place where the system works as smoothly as possible," Baca said. "The original arresting agency has to, up front, do a better job in vetting the person.... This is going to require a lot of analysis and review.... We can't say that we do better, we can always do better, but I'm dependent on other police agencies to also do better."

Victims of mistaken identification typically go through several rounds of checks before they land in L.A. County Jail. Arresting officers use the name, birth date and driver's license number of the person they stop to check for warrants. The first fingerprint check is usually done when officers bring the people they arrest to the police station where they are booked. From there, inmates are taken either to court or directly to County Jail.

Once inmates arrive at the jail, officials there review the fingerprints again and compare the warrant to the personal information for the inmate.

The errors occur in jails up and down the state, and many of the misidentified inmates in the L.A. County sheriff's jails were arrested by law enforcement agencies outside the county.

In California, people who are arrested are assigned a unique nine-digit number matched to their fingerprints. Some warrants issued by judges fail to include those identifiers, making it more difficult for police and jailers to determine whether they have the right suspect.

When those fingerprint numbers are included, police agencies sometimes fail to determine why the arrested person has a different number or no number at all. In those cases, authorities could catch the error by obtaining the wanted suspect's fingerprints from the state Department of Justice and comparing them with those of the person in custody.

The number of mistaken identifications has been declining, and the cases make up just a tiny fraction of the population inside L.A. County lockups, the largest jail system in the nation. But for those who are jailed, the experience can be harrowing.

In one case reported by The Times, a mechanic held for nine days in 1989 on a warrant meant for someone else was detained again 20 years later on the same warrant. He was jailed for more than a



Ads by Google

**New 2012 Toyota**
Buy a New Toyota Car & Get Ready To Save More. View Inventory Now!
SouthernCalifornia.BuyAToyota.com

**Are You Writing a Book?**
Get a free guide to professional editing & publishing options.
www.iUniverse.com

**Win Your Election in 2012**
Powerful Campaign Websites for GOP Candidates. $50/mo. Try Free!
www.NetBoots.net

**Romney for President ?**
Can Newt Gingrich beat Romney for president? Vote in poll.
www.newsmax.com

**LA**DEALS

$15 for $30 towards Fine Food Fare at the Pig 'N Whistle

| Most Viewed | Most Emailed | Latest News |

New high-end realty offices opening despite real estate downturn *12/28/2011, 4:38 p.m.*

U.S. stocks falter, drag S&P 500 index into the red for 2011 *12/28/2011, 4:00 p.m.*

Online shoe clubs are in step with fashion-forward women *12/28/2011, 4:00 p.m.*

Sorting through the bloody mess of Bloody Marys *12/28/2011, 4:00 p.m.*

New Year's Eve noshing: 25 easy-to-make dishes *12/28/2011, 4:00 p.m.*

## Videos

### LAX TSA Chorus
TSA employees at LAX entertain airport visitors with Christmas and holiday songs...

Expand         Share Video:  

**LA Times 12/28/11 Article**             **-32-**             **EXHIBIT C**

month the second time before the error was discovered.

In another instance, a Nissan customer service supervisor was hauled by authorities from Tennessee to L.A. County on a local sex-crimes warrant meant for someone with a similar name.

In a third case, a former construction worker mistaken for a wanted drug offender said another inmate pushed him to the floor in the showers, leaving him naked on the ground with back pain.

*robert.faturechi@latimes.com*

*jack.leonard@latimes.com*

*Los Angeles Times staff writer Rong-Gong Lin II contributed to this report.*

Copyright © 2011, Los Angeles Times

 Comments **40**    Share **67**    1    Tweet 27    Recommend 38

**MORE FROM THE TIMES**

Donald Trump breaks with GOP, changes party registration

Low-carb diets beat low-cal for cutting pounds and cancer risk, study finds

Pakistani death squads go after informants to U.S. drone program

Pro / Con: Spanking

Sarah Palin criticizes Obama holiday card -- and the dog

**FROM AROUND THE WEB**

Krugman: "Gold bugs have taken over the GOP" | *Gold Standard Now*

Types of Weapons Evidence Found in Criminal Cases | *eHow*

Mother of Murdered 9-Year-Old Couldn't Have Known Babysitter Was Psycho | *The Stir By CafeMom*

15 Foods to Avoid with High Blood Pressure | *HealthCentral.com*

Lose the Laptop, Not the Data | *PC World Latest Technology News*

[what's this]

Ads by Google

**Sensodyne Coupon**
Save Now On The Dentist Trusted Brand for Tooth Sensitivity.  us.sensodyne.com

**Therapy for Anxiety**
Overwhelmed with anxiety at work? I help you manage life's curve balls  www.drmayatherapy.com



**California Public Records »**



Help keep government open and honest — share your documents.

**LA Times 12/28/11 Article**                    **-33-**                    **EXHIBIT C**

## Comments (40)

Add / View comments | Discussion FAQ

**frankie4** at 4:02 PM December 28, 2011
HIVELOCT.arent you a cop,ther police in this state are very dangerous and do nothing,thats a fact.your name calling and carring on like a child only go to prove more just how bad the police are,American citizens have a right to a police force that works for them,that protects their rights and up hold laws,why dont the police do any of that.why as a business owner when I tried to report bad checks,stolen cars,break ins,the police show up days later,and all they did was laugh and did nothing,so take all of your BS and stick it.the people deserve better.the damage the police cause is massive,in riuned lives,cost to the tax payers,the murders,beating,extortion,false arrests.why is it the tax payers are paying cops 200k a year to do nothing but terrorise every one,what purpose do they serve the people.

**Ashley Carey** at 1:44 PM December 28, 2011
It's time for Baca to plead guilty. With countless reports of abusive deputies who punish suspects as they see fit, hundreds of claims of forced humiliation and excessive detainment, and countless examples of the LASD's lack of operative planning, it's outrageous to see that Sheriff Baca still isn't sure what the problem is. Let's start with a properly functioning internal investigations board, and go from there. The people of Los Angeles are tired of being physically and mentally abused for simple misdemeanors. It's time to step back, widen your gaze, and punish your power-hungry frothing-at-the-mouth deputies who see nothing wrong with forcing suspects to urinate on the seats of your sheriff's buses. Citizens of this country are innocent until proven guilty, and your department does not get a say in who's guilty and what punishments and inhumane mistreatments they deserve.

**iwantto** at 12:54 PM December 28, 2011
What happened to the Natalie Wood investigation?  That sure threw everyone off the jail house scandal, didnt it?
Baca should be removed for wasting tax payer money and poor performance.  How long is the public going to be led through LA by the nose from this corrupt man?

*Comments are filtered for language and registration is required. The Times makes no guarantee of comments' factual accuracy. Readers may report inappropriate comments by clicking the Report Abuse link next to a comment. Here are the full legal terms you agree to by using this comment form.*

## Today in Events »

Downtown on Ice   *Pershing Square Park*

2 for 1 Wednesdays for San Juan Capistrano Residents   *Mission San Juan Capistrano*

Beverly Hills Trolley Tours   *Beverly Hills Trolley*

What   Community Events

Where   Hollywood   **GO**

## Reader Travel Photos »



Share your travel photos. We'll feature the best in print and online. Above, Reed Flute Caves, China.

### In Case You Missed It...


**Photos:** Celebrities by the Los Angeles Times in 2011


**Photos:** Lisa Ling's new Santa Monica house


**Photos:** 130 years of Times' photography


**Photos:** Pointless apologies of 2011


**Photos:** 103 road trips from SoCal

More spotlights...

Corrections        Horoscopes        Media Kit        About Us        Contact Us        Site Map

## Los Angeles Times

Burbank Leader | Coastline Pilot | Daily Pilot | Huntington Beach Independent | News Press | Pasadena Sun | Valley Sun | KTLA | Hoy | Los Angeles Times Magazine
Baltimore Sun | Chicago Tribune | Daily Press | Hartford Courant | Los Angeles Times | Orlando Sentinel | Sun Sentinel | The Morning Call

Terms of Service | Privacy Policy | About Our Ads | Los Angeles Times, 202 West 1st Street, Los Angeles, California, 90012 | Copyright 2011

*A Tribune Newspaper website*

**LA Times 12/28/11 Article**        -34-        **EXHIBIT C**